# IN THE DISTRICT COURT OF THE UNITED STATES
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION

## CIVIL CASE NO. 3:07cv258

MICHAEL L. WINTON,                )
                                  )
            Plaintiff,            )
                                  )        **MEMORANDUM OF**
       vs.                        )        **DECISION AND ORDER**
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of Social Security,  )
                                  )
            Defendant.            )
                                  )
_____

**THIS MATTER** is before the Court on the Plaintiff's Motion for

Summary Judgment [Doc. 7]; and the Defendant's Motion for Summary

Judgment [Doc. 10].

## PROCEDURAL HISTORY

The Plaintiff Michael L. Winton filed an application for a Period of

Disability and Social Security Disability Insurance Benefits on April 4, 2000,

alleging that he had become disabled as of July 6, 1999.  [Transcript ("Tr.")

29, 73-76].  The Plaintiff's claim was denied initially and on reconsideration.

[Tr. 61, 66].  Upon the Plaintiff's request, a hearing was held on August 10, 2001.  [Tr. 71].  On September 26, 2001, the Administrative Law Judge (ALJ) determined that the Plaintiff had been disabled from July 6, 1999 through May 28, 2001 due to lymphoma and degenerative disc disease with sciatica, but not for any time thereafter.  [Tr. 325-338].  There is no evidence in the record that the Plaintiff sought review of the Commissioner's decision.

The Plaintiff subsequently filed a second application for a period of disability and Social Security disability benefits on August 21, 2002, alleging that he had become unable to work on September 27, 2001, the day after the previous ALJ decision.  [Tr. 369-71].  The Plaintiff's application was denied initially and on reconsideration.  [Tr. 349, 359].  A hearing was held on July 21, 2005.  [Tr. 666-702].  On July 28, 2005, the ALJ issued a decision denying the Plaintiff benefits.  [Tr. 29-37].  The Plaintiff requested a review of the hearing by the Appeals Council and submitted additional evidence in support of his request.  [Tr. 24].  The Appeals Council accepted the additional evidence and made it part of the record [Tr. 11], but denied the Plaintiff's request for review, finding that this

additional evidence did not provide a basis for changing the ALJ's decision. [Tr. 8-10]. This civil action followed. [Doc. 1].

## STANDARD OF REVIEW

The Court's review of a final decision of the Commissioner is limited to: (1) whether substantial evidence supports the Commissioner's decision, see Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), and (2) whether the Commissioner applied the correct legal standards, Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

The Social Security Act provides that "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive...." 42 U.S.C. § 405(g). The Fourth Circuit has defined "substantial evidence" as "more than a scintilla and [doing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986) (quoting Perales, 402 U.S. at 401, 91 S.Ct. at 1427).

The Court may not re-weigh the evidence or substitute its own judgment for that of the Commissioner, even if it disagrees with the Commissioner's decision, so long as there is substantial evidence in the record to support the final decision below.  Hays, 907 F.2d at 1456; Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## THE SEQUENTIAL EVALUATION PROCESS

In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process.  20 C.F.R. §§404.1520, 416.920.  If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied.  Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of the medical condition, age, education, or work experience of the applicant.  20 C.F.R. §§404.1520, 416.920. Second, the applicant must show a severe impairment.  If the applicant does not show any impairment or combination thereof which significantly limits the physical or mental ability to perform work activities, then no severe impairment is shown and the applicant is not disabled.  Id.  Third, if the impairment meets or equals one of the listed impairments of Appendix

1, Subpart P, Regulation 4, the applicant is disabled regardless of age, education or work experience.  Id.  Fourth, if the impairment does not meet the criteria above but is still a severe impairment, then the ALJ reviews the claimant's residual functional capacity and the physical and mental demands of work done in the past.  If the claimant can still perform that work, then a finding of not disabled is mandated.  Id.  Fifth, if the claimant has a severe impairment but cannot perform past relevant work, then the ALJ will consider whether the applicant's residual functional capacity, age, education, and past work experience enable the performance of other work.  If so, then the claimant is not disabled.  Id.  In this case, the ALJ's determination was made at the fifth step.

## FACTS AS STATED IN THE RECORD

The Plaintiff was born on November 28, 1955 and was 49 years old at the time of the hearing before the ALJ.  [Tr. 670].  He completed the tenth grade and obtained his GED.  [Tr. 671].  He has prior work experience as a truck driver, forklift operator, and a warehouse supervisor. [Tr. 689-91].

The Plaintiff has a history of lymphoma, sciatica, and asthma. He was diagnosed with lymphoma in July 1999. [Tr. 127, 128]. He underwent chemotherapy, and his condition improved. A CT scan of the Plaintiff's chest in March 2001 showed no evidence of new or recurrent lymphoma. [Tr. 304]. During a visit in December 2001 to his treating physician, Dr. Martin English, the Plaintiff complained of a lump in the lower part of his chest, which was more prominent when standing. [Tr. 451]. A complete physical examination in February 2002 revealed elevated liver enzymes, and he tested positive for Hepatitis C. [Tr. 455]. An ultrasound showed borderline liver volume, but the hepatic echo pattern was normal, and there were no gallstones identified, no evidence of bile duct obstruction, no abnormality of the pancreas, and no fluid collection in the right upper quadrant. [Tr. 486]. Dr. English noted that the Plaintiff's prior head CT was negative and that his lymphoma and sciatica appeared stable. [Tr. 453]. He also observed that the Plaintiff had normal air movement without wheezes or rubs; that his heart rate and rhythm were regular; that he had no edema in his extremities; and that the EKG demonstrated that he had a normal sinus rhythm. Dr. English recommended that the Plaintiff engage in regular exercise. [Tr. 453-54].

In March 2002, the Plaintiff reported to Dr. English that he was having headaches and that the lump in his chest was getting bigger and was tender.  [Tr. 457].  An ultrasound revealed a chest wall mass characteristic of a lipoma.  [Tr. 488].  The Plaintiff was referred to Dr. Bryan Blitstein, who excised the mass.  [Tr. 491].  Dr. Blitstein's progress notes of May 2002 indicate no pain or other symptoms, although the Plaintiff developed an infection at the excision site a month later.  The infection eventually healed.  [Tr. 463, 465].

In July 2002, the Plaintiff complained of breathing problems which got worse when he was outside, along with fatigue despite sleeping 14 hours per day.  The Plaintiff also reported recurrent headaches.  Dr. English found that the Plaintiff's chest was clear to auscultation, that he was in no respiratory distress, and that his pulse oxygen level was 97%. [Tr. 465].

Although the Plaintiff continued to complain of shortness of breath upon exertion, his asthma remained stable.  The Plaintiff's treating oncologist, Dr. Ronald Butler, noted that a February 2002 x-ray indicated improved aeration of both lungs, when compared to a previous x-ray of December 26, 2001.  [Tr. 446].  Dr. Butler further noted that the Plaintiff

appeared to be healthy and in no acute distress; that his lungs were clear to auscultation and his heart rate and rhythm were regular; and that his chest x-ray showed no evidence of recurrence of pulmonary lymphoma. [Tr. 440, 446]. Dr. Butler concluded that the Plaintiff "continued to do well," and that he did not need to return to the office for six months. [Tr. 440]. Dr. Butler similar observed in July 2002 that the Plaintiff appeared healthy and remained without evidence of recurrence of his pulmonary lymphoma. [Tr. 441].

In October 2002, the Plaintiff was seen by Dr. English for severe pain in his back radiating into his right thigh and persistent headaches. There was no significant tenderness in his back, and the strength in his lower extremities was normal. He reported that his headaches were relieved with Vicodin. [Tr. 466]. In November, 2002, the Plaintiff's back pain had worsened, and he was moving stiffly. Straight leg raising was positive. [Tr. 468]. The Plaintiff also had recurrent problems with sinusitis. [Tr. 470, 471]. In January 2003, Dr. English again noted that the Plaintiff's chest was clear to auscultation, and that his back had no CVA tenderness. [Tr. 470].

In March 2003, Dr. English opined that the Plaintiff was fully disabled and unable to perform his job or any other job due to chronic fatigue, shortness of breath with exertion, and chronic lower back pain radiating into his leg. [Tr. 504].

On July 9, 2003, the Plaintiff underwent a consultative examination by Dr. Tyler I. Freeman. Dr. Freeman found the Plaintiff's physical examination, range of motion, and vital signs all to be within normal limits. Specifically, Dr. Freeman noted that the Plaintiff's lungs were clear, and that his heart tones, joints, range of motion, and ability to walk were normal. He further noted that the Plaintiff's grip strength was equal bilaterally; that he had full muscle strength; that there was no evidence of motor or sensory deficits; that the Plaintiff was able to perform heel-toe maneuvers and dextrous movements with his hands; and that the Plaintiff could squat, rise, grasp, and raise his arms overhead. The Plaintiff reported that he had asthmatic attacks only during exertion. Dr. Freeman noted that the Plaintiff ambulated normally and was able to get on and off the examination table without assistance. [Tr. 498-500]. A chest x-ray performed on that same date revealed no active lung disease. [Tr. 502].

Dr. English completed a multiple impairments questionnaire in June 2004, noting that the Plaintiff's primary symptoms were chronic low back pain, fatigue, shortness of breath, and headaches. He noted the following limitations: no sitting over two hours or standing/walking over one hour in an eight-hour day; no lifting over 20 pounds; and no bending or stooping. Dr. English found that the Plaintiff was capable of low stress work but would have to take unscheduled breaks at least hourly and have to rest 15 to 30 minutes before returning to work. [Tr. 505-11].

In December 2004, the Plaintiff developed problems with his right shoulder. He was diagnosed with a rotator cuff tear, and surgery was scheduled. No surgical records were presented to the ALJ. [Tr. 512-14].

The Plaintiff was examined by state agency consultants in 2002. Both consulting physicians concluded that the Plaintiff can sit for about six hours and stand/walk for about six hours in an eight-hour workday. [Tr. 413-33].

At the ALJ hearing, the Plaintiff testified that he has sciatic nerve problems, prostatitis with incontinence, and asthma. [Tr. 673]. He testified that he has problems bending and climbing stairs because of his back problems. [Tr. 681]. He testified that due to asthma he can walk only up to

20 minutes at a time. [Tr. 677]. The Plaintiff reported that he can sit for 25 to 30 minutes at a time in a recliner to elevate his legs. [Tr. 676]. He reported that heat and enclosed areas make it harder for him to breathe. [Tr. 677]. Due to his prostate condition, the Plaintiff must go to the bathroom every two hours; he testified that he occasionally wears adult diapers to avoid accidents and always carries a change of clothes with him in case of an accident. [Tr. 675, 683]. With respect to his activities of daily living, the Plaintiff testified that his wife performs all of the chores around the house. [Tr. 680]. He testified that he is able to drive. [Tr. 679]. He testified that he goes to church every Sunday and occasionally preaches or teaches Sunday school. [Tr. 671-72, 684-85]. He reported that he can read for a couple of hours at a time. [Tr. 685]. The Plaintiff reported having shoulder surgery about six weeks prior to the hearing and that as a result he cannot get his right arm above his head or lift or grip anything. He testified that prior to the surgery, he was able to lift up to 40 pounds. [Tr. 678].

A vocational expert, Robert Ballantyne, Ph.D., also testified at the Plaintiff's hearing. The vocational expert testified that the Plaintiff's past relevant work as a truck driver, fork lift operator, and warehouse supervisor

were all characterized as medium in exertional level and low level semi-skilled positions. [Tr. 691]. The ALJ posed the following hypothetical to the vocational expert:

> Now, assuming I find for a relevant 12 month period available to me, that the claimant's exertional impairments would permit at least sedentary and light work on a sustained basis but with significant non-exertional limitations. First of all, I would need to rule out jobs requiring frequent or repetitive bending, stooping, climbing, balancing. Assume also I would require job situations where there was not exposure to significant amounts of dust, fumes, chemicals, environmental pollutants of that nature. And include extremes of temperature either heat or cold. And finally a degree of significant pain which with appropriate medication would permit the concentration for unskilled or semi-skilled work, but would rule out jobs requiring sustained skilled concentration in an eight hour day. If I were to place those non-exertional restrictions on a male of 45 to 59 with a high school or GED educational level, and with the prior work to the extent it might be relevant, are there jobs such a person could do?

[Tr. 692-93]. The vocational expert responded in the affirmative, opining that there are a significant number of jobs in the national economy that the Plaintiff could perform, including work as an office equipment operator, a general mail clerk, and a storage rental clerk. He further testified that a sit/stand option would be available for these positions. [Tr. 692-94].

## THE ALJ'S DECISION

On August 24, 2006, the ALJ issued a decision denying the Plaintiff's claim. [Tr. 29-37]. Using the five-step sequential evaluation process promulgated by the Social Security Administration, see 20 C.F.R. §§404.1520, 416.920, the ALJ made the following findings. At step one, the ALJ found that the Plaintiff has not engaged in substantial gainful activity since the alleged onset date of disability. At step two, the ALJ found that the Plaintiff has the following severe impairments: lumbar degenerative disc disease with sciatica, asthma, and prostatitis. While the ALJ noted that the Plaintiff has been treated for a number of other problems (lymphoma, Hepatitis C, headaches, and residuals from surgery on his right shoulder), the ALJ found that these conditions constituted "non-severe" impairments. At step three, the ALJ concluded that none of the Plaintiff's impairments, either singly or in combination, meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. [Tr. 31].

Proceeding to step four, the ALJ determined the Plaintiff has the residual functional capacity to perform physical and mental work activities on a sustained basis despite limitations from his impairments. While

finding that the Plaintiff has impairments that could reasonably be expected to produce the alleged symptoms and which have a significant impact on his ability to perform work-related activities, the ALJ concluded that the Plaintiff's testimony regarding the intensity and limiting effects of his symptoms was not persuasive in view of the entire record.  [Tr. 32-33].

Considering all of the Plaintiff's impairments, the ALJ concluded that the Plaintiff has the residual functional capacity to perform light work with simple, routine, repetitive tasks, with the following exertional and non-exertional limitations: no frequent or repetitive bending, stooping, climbing or balancing, and no significant exposure to fumes, chemicals, and temperature extremes.  [Tr. 33].  The ALJ went on to find that the Plaintiff is unable to perform any past relevant work and has no transferable skills; that he is a "younger individual"; and that he has a high school equivalent education.  [Tr. 34].  Finally, at step five of the sequential process, and based upon testimony of the vocational expert, as well as the Plaintiff's age, education, work experience, and residual functional capacity, the ALJ found that there are jobs that exist in significant numbers in the national economy that the Plaintiff can perform.  [Tr. 35].  Accordingly, the ALJ concluded that the Plaintiff has not been under a "disability" as defined by

the Social Security Act from the alleged onset date of September 27, 2001 through the date of the decision, July 28, 2005.  [Tr. 35].

**Additional Evidence Presented to the Appeals Council**

In support of his request for review, the Plaintiff submitted additional evidence to the Appeals Council, including treatment records dated January 2003 to October 2006 from Dr. English [Tr. 525-607]; treatment records dated November 2004 to December 2006 from OrthoCarolina, an orthopedic center [Tr. 608-42]; and treatment records dated December 2002 to October 2006 from urologist Dr. Ralph Vick [Tr. 643-61.

Dr. English's records reflect that from June 2003 to late 2005, the Plaintiff was treated for recurrent hip pain with injections of Decadron.  [Tr. 527-36, 546-54].  The Plaintiff also received medication for asthma and sinusitis.  [Tr. 550].  In July 2004, the Plaintiff presented with pain under the lower part of his sternum.  Dr. English diagnosed the Plaintiff with ventral abdominal wall hernia and referred him to a surgeon for repair.  [Tr. 542].  The Plaintiff also complained to Dr. English of right shoulder pain that increased with movement.  In November 2004, the Plaintiff complained of continued right shoulder pain and popping.  [Tr. 538].

From December 2004 through September 2005, the Plaintiff repeatedly complained to Dr. English of right hip pain. During each visit, Dr. English maintained his diagnosis of right hip bursitis and injected Decadron in the identified region. Dr. English noted that these injections provided immediate, although temporary, relief. [Tr. 527-36].

In his last visit of record on September 30, 2005, the Plaintiff presented to Dr. English for a follow-up visit. The Plaintiff complained of insomnia, but reported that he was sleeping well with medication. He still complained of a cough and headaches, for which he was prescribed medication. The Plaintiff reported being "somewhat moody," and Dr. English increased the dosage of his antidepressant. [Tr. 525].

The records of OrthoCarolina reveal that during the early part of 2005, the Plaintiff was seen for three post-surgery follow up visits. By February 2005, the Plaintiff had regained full passive range of motion in his shoulder. [Tr. 612-14]. The Plaintiff reported reinjuring his right shoulder after undergoing a colonoscopy in the summer of 2005. An examination revealed a strain or sprain in the rotator cuff of the right shoulder, for which he was prescribed pain medication. [Tr. 610].

From September 2005 through November 2006, the Plaintiff continued to be seen by OrthoCarolina for right hip pain, back pain, and right leg pain.  In July 2006, the Plaintiff received a nerve root block at the right L5 neural foramen.  [Tr. 624-26].  In August 2006, the Plaintiff reported that the injection helped for two to three days, but then the pain returned to normal.  An examination revealed excellent range of motion in his hip, no tension in straight leg raising, and 5/5 motor examination of the lower extremities.  [Tr. 627].

In November 2006, the Plaintiff reported pain in his left shoulder.  A physical examination revealed minimal impingement signs and full range of motion in both shoulders.  A radiograph revealed acromioclavicular joint osteoarthritis in the left shoulder.  The Plaintiff was treated with a cortisone injection.  [Tr. 632-33].  A subsequent MRI showed degenerative change and impingement with mild rotator cuff tendinopathy.  [Tr. 636].  The last record from OrthoCarolina shows that by November 30, 2006, the Plaintiff felt that the cortisone injections had failed, and he indicated that he would like to proceed with surgery on his left shoulder.  [Tr. 639].

The treatment records of Dr. Vick reveal that during the period from September 2005 through October 2006, the Plaintiff regularly saw Dr. Vick

for treatment of epididymitis, elevated prostate antigen, and urinary tract symptoms. The Plaintiff reported symptoms of severe frequency, hesitancy, and post-void dribble, symptoms which Dr. Vick identified as classic symptoms of bladder obstruction. [Tr. 651]. On September 23, 2005, Dr. Vick performed a prostate biopsy which revealed a pre-malignant lesion. [Tr. 648, 649]. On May 17, 2006, Dr. Vick performed a transurethral resection of the Plaintiff's prostate. [Tr. 651]. The Plaintiff reported significant improvement in urination following this procedure. [Tr. 652, 660].

## DISCUSSION

The Plaintiff asserts three assignments of error on appeal. First, he argues that the ALJ erred in his determination that there was a medical improvement in the Plaintiff's condition as of May 29, 2001. Second, the Plaintiff argues that the ALJ erroneously evaluated the testimony of the vocational expert. Third, the Plaintiff contends that the ALJ failed to assess the Plaintiff's credibility properly. The Court will address each of these assignments of error *seriatim*.

## A.    Medical Improvement

In arguing that the ALJ erred in his determination that there had been medical improvement in Plaintiff's condition since May 2001, the Plaintiff contends that the ALJ failed to perform the required medical improvement analysis.  [Doc. 8 at 15-17].  The applicable regulations provide that a claimant who has been awarded disability benefits will have this award periodically reviewed, and if the Commissioner determines that the claimant's impairment has improved medically and the claimant is able to perform substantial gainful activity, then the claimant's benefits will be terminated.  See 20 C.F.R. §404.1594.  In the present case, the ALJ was not required to perform the medical improvement analysis.  In the September 26, 2001 decision, the ALJ determined that the Plaintiff had been disabled from July 6, 1999 through May 28, 2001, but that as of May 29, 2001, the Plaintiff's condition had improved medically and he was no longer disabled.  [Tr. 333].  The Plaintiff did not challenge this decision before either the Appeals Council or this Court.  As such, the Commissioner's decision became res judicata and binding on all parties. See 20 C.F.R. §404.955; Meekins v. United Transp. Union, 946 F.2d 1054, 1057 (4th Cir. 1991).  The Plaintiff's counsel conceded as much during the

ALJ hearing. [Tr. 669]. Because the Plaintiff did not challenge the finding that his impairments had improved medically as of May 29, 2001, and the Plaintiff's current disability application pertains only to his condition from September 2001 to September 2006, the Plaintiff has failed to demonstrate that the ALJ was required to conduct the medical improvement analysis in this case.

The Plaintiff argues that in determining that there had been a medical improvement in the Plaintiff's condition, the ALJ failed to evaluate properly the June 2004 and January 2005 functional capacity assessments of Plaintiff's treating physician, Dr. English. The Plaintiff contends that these assessments show that the Plaintiff's condition actually deteriorated, rather than improved, after May 29, 2001. [Doc. 8 at 17].

The ALJ must evaluate the opinion of a treating physician to determine whether such opinion is entitled to controlling weight. See 20 C.F.R. §404.1527(d)(2); Pittman v. Massanari, 141 F.Supp.2d 601, 608 (W.D.N.C. 2001). In order for a physician's opinion to be given controlling weight: (1) the opinion must be from a treating source; (2) the opinion must be a medical opinion regarding the nature and severity of the plaintiff's impairments; and (3) the opinion must be "well-supported by medically

acceptable clinical and laboratory diagnostic techniques."  Social Security Ruling (SSR) 96-2p.  Even if the physician's opinion is well supported by his own medical findings, however, the ALJ will not give such opinion controlling weight if it is inconsistent with "other substantial evidence" in the record.  Id.

In the present case, the ALJ referenced Dr. English's findings and concluded that his opinions of total disability were not supported by the testimony or by the objective evidence in the record.  In addition, the ALJ determined that Dr. English's opinions were entitled to little weight as he was not a vocational expert and his own medical records showed that he had not seen the Plaintiff since February 2003.  [Tr. 33].  The Plaintiff challenges both of these bases for discounting Dr. English's opinion.

A review of Dr. English's medical records reveals that his conclusion of disability in the June 2004 and January 2005 functional capacity assessments are inconsistent with his findings in his treatment of the Plaintiff.  In February 2002, Dr. English noted that the Plaintiff's prior head CT was negative, and that his lymphoma and sciatica appeared stable. [Tr. 453].  He also observed that the Plaintiff had normal air movement without wheezes or rubs; that his heart rate and rhythm were regular; that

he had no edema in his extremities; and that the EKG demonstrated that he had a normal sinus rhythm. Dr. English recommended that the Plaintiff engage in regular exercise. [Tr. 453-54]. In July 2002, Dr. English found that the Plaintiff's chest was clear to auscultation, that he was in no respiratory distress, and that his pulse oxygen level was 97%. [Tr. 465]. Dr. English further observed in October 2002, that the Plaintiff's back had no significant costovertebral angle (CVA) tenderness, and that his lower extremity strength was normal. [Tr. 466]. In January 2003, Dr. English again noted that the Plaintiff's chest was clear to auscultation, and that his back had no CVA tenderness. [Tr. 470].

Dr. English's functional capacity assessments are also inconsistent with other evidence in the record. In February 2002, Plaintiff's oncologist, Dr. Butler, noted that he was healthy and in no acute distress; that his lungs were clear to auscultation and his heart rate and rhythm were regular; and that his chest x-ray showed no evidence of recurrence. [Tr. 440, 446]. Dr. Butler concluded that the Plaintiff "continued to do well without evidence of recurrence of his maltoma," and that he did not need to return to the office for six months. [Tr. 440]. Dr. Butler similarly observed in July 2002 that the Plaintiff appeared healthy and remained without

evidence of recurrence of his pulmonary lymphoma. [Tr. 441]. In July 2003, Dr. Freeman found the Plaintiff's physical examination, range of motion, and vital signs all to be within normal limits. Specifically, Dr. Freeman noted that the Plaintiff's lungs were clear, and that his heart tones, joints, range of motion, and ability to walk were normal. He further noted that the Plaintiff's grip strength was equal bilaterally; that he had full muscle strength; that there was no evidence of motor or sensory deficits; and that the Plaintiff was able to perform heel-toe maneuvers and dextrous movements with his hands, as well as squat and rise, grasp and raise his arms overhead. [Tr. 499-501].

The Plaintiff's second argument that the ALJ's rationale for rejecting Dr. English's opinions was flawed is founded on the ALJ having made his determination on the "erroneous assumption" that Dr. English had examined the Plaintiff last in February 2003. [Doc. 8 at 19]. The ALJ made this assumption on the grounds that, although the Plaintiff produced two disability reports from Dr. English, the Plaintiff failed to produce any records indicating that he was receiving treatment at the time that Dr. English completed these reports. While the ALJ's assumption ultimately may have been shown to be incorrect (as subsequent records submitted to

the Appeals Council indicate that Dr. English did continue to see the Plaintiff after 2003), there is still substantial evidence to support the ALJ's evaluation of Dr. English's opinions. See Moore v. Comm'r of Social Security, No. 3:07cv2, 2008 WL 474073, at *2 (N.D. W.Va. Feb. 20, 2008) (despite incorrect statements in the ALJ's credibility analysis, substantial evidence supported overall credibility determination). The ALJ found that Dr. English's opinions of total disability were not consistent with his own medical records, the objective medical evidence, and the hearing testimony. [Tr. 33]. For the reasons discussed above, there is substantial evidence to support the ALJ's rejection of Dr. English's opinions.

Following the ALJ's decision, the Plaintiff submitted additional evidence to the Appeals Council, including records of Dr. English's continued treatment of the Plaintiff after February 2003. As the Appeals Council correctly concluded, however, this additional evidence does not necessitate a change in the findings of the ALJ. See Browning v. Sullivan, 958 F.2d 817, 823 (4th Cir. 1992). These additional records show that the Plaintiff's insomnia, headaches, and asthma were adequately controlled by medications. [Tr. 525-59]. While the Plaintiff continued to experience pain from sciatica, an August 2006 examination revealed excellent range of

motion in his hip, no tension in straight leg raising, and 5/5 motor examination of the lower extremities. [Tr. 627]. Following surgery on his right shoulder, the Plaintiff regained full range of motion. Although he subsequently strained or sprained his right shoulder, this injury was treated with medication. [Tr. 610-14]. Further, the Plaintiff's urinary problems improved greatly following the transurethral resection of his prostate in May 2006. [Tr. 651, 652, 660].

For the foregoing reasons, the Court concludes that the ALJ properly evaluated the evidence in the record, and that there is substantial evidence to support the ALJ's determination that the Plaintiff is not disabled. Further, the additional evidence submitted to the Appeals Council does not provide a basis for changing this decision.

### B. Vocational Expert Testimony

Next, the Plaintiff contends that the ALJ erroneously evaluated the testimony of the vocational expert. Specifically, the Plaintiff contends that the ALJ's hypothetical questions to the vocational expert failed to include all of the limitations imposed by his treating physician, and therefore, the ALJ erred in relying upon the vocational expert's testimony in determining

that there were other jobs in the national economy that the Plaintiff could perform.  [Doc. 8 at 20].

As previously discussed, the ALJ concluded that Dr. English's assessments of the Plaintiff's functional capacity were not supported by his own medical findings or the other objective evidence in the record.  As such, these limitations were properly excluded from the ALJ's hypothetical question to the vocational expert.  <u>See</u> <u>Walker v. Bowen</u>, 889 F.2d 47, 50-51 (4th Cir. 1989).  Accordingly, the Plaintiff's second assignment of error is without merit.

### C.   Plaintiff's Credibility

Lastly, the Plaintiff argues that the ALJ failed to assess the Plaintiff's credibility properly.  Specifically, he argues that the ALJ erred in concluding that the Plaintiff's testimony was not fully credible due to the fact that the Plaintiff is capable of caring for his personal needs, going to church, and reading for up to two hours.  The Plaintiff further contends that the ALJ's credibility determination was also based on the erroneous assumption that the Plaintiff has not sought treatment from Dr. English since February 2003.  [Doc. 8 at 21].

Assessing the credibility of a claimant's symptoms of pain is a two-step process.  Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); SSR 96-7p.  First, a claimant must establish, by objective medical evidence, "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and *which could reasonably be expected to produce the pain or other symptoms alleged*."  Craig, 76 F.3d at 594 (quoting 20 C.F.R. §§ 416.929(b) and 404.1529(b)).  If a claimant meets this burden, the ALJ must then evaluate the manner in which the intensity and persistence of these symptoms affect the claimant's ability to work.  Craig, 76 F.3d at 595.  In so doing, the ALJ must consider

> not only the claimant's statements about [his] pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

Craig, 76 F.3d at 595 (internal citations omitted).  "Because he had the opportunity to observe the demeanor and to determine the credibility of the

claimant, the ALJ's observations concerning these questions are to be given great weight."  Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).

The Plaintiff argues that the ALJ's credibility evaluation was defective because the ALJ premised his analysis on the fact that the Plaintiff had not sought treatment from Dr. English since February 2003.  [Doc. 8 at 21]. The lack of treatment records, however, was not the sole basis for the ALJ's credibility determination, and there is other substantial evidence to support the ALJ's credibility finding.  See Moore, 2008 WL 474073, at *2. As the ALJ noted, the Plaintiff is able to take care of his personal needs. He attends church on a regular basis and occasionally preaches and teaches Sunday school.  He is able to drive, and he also can read to up to two hours at a time, activities which demonstrate that he has no problems staying focused or maintaining task persistence.  Additionally, as the ALJ noted, the Plaintiff's need to go to the bathroom every two hours would not preclude all work.  [Tr. 33].  In light of these facts, the Court finds that there is substantial evidence to support the ALJ's credibility determination.

## CONCLUSION

For the foregoing reasons, the Court concludes that the Commissioner applied the correct legal standards and that there is substantial evidence to support the Commissioner's determination that the Plaintiff is not disabled within the meaning of the Social Security Act.

## O R D E R

Accordingly, **IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Summary Judgment [Doc. 7] is **DENIED**; the Defendant's Motion for Summary Judgment [Doc. 10] is **ALLOWED**; and the Commissioner's decision is hereby **AFFIRMED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED WITH PREJUDICE**, and judgment shall issue simultaneously herewith.

**IT IS SO ORDERED.**

Signed: August 13, 2008

Martin Reidinger
United States District Judge